## Fritts v. Swiss Cleaners & Dyers.

(Decided January 21, 1915.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Fourth Division).

Contracts—Contemplating Personal Supervision or Service of One Party—Rights of Parties.—Where a contract provides, and it is the intention of the parties, that one of them shall render personal service or give personal supervision to the business created by the contract, the other party is entitled to this personal service or supervision and cannot be compelled to renew the contract when the other party has put it out of his power to give the attention or supervision contemplated by the contract, although the contract may in terms provide for its renewal after the expiration of a time fixed in the contract.

BLAKEY, QUIN & LEWIS for appellant.

R. W. BINGHAM, EMANUEL LEVI and KOHN, BINGHAM, SLOSS & SPINDLE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

In February, 1908, and for some twelve years prior thereto, Mrs. Fritts, the appellant, had been engaged in the glove cleaning business in the city of Louisville and had established a wide reputation for skill and pro-

ficiency in this business, which she conducted under the trade name of the Louisville Glove Cleaning Company.

The appellee, Swiss Cleaners & Dyers, in February, 1908, were also engaged in the general business of cleaning and dyeing clothing of all sorts in the city of Louisville, and being desirous of engaging the services of Mrs. Fritts as a cleaner of gloves in connection with their business, on February 28, 1908, the following contract was entered into between Swiss Cleaners & Dyers, as party of the first part, and Mrs. Fritts, party of the second part:

"Witnesseth: That whereas the party of the first part is desirous of interesting the party of the second part in said first party's business, and to have the said second party take charge of, control, and supervise so much of the first party's business as may pertain or apply to the cleaning of gloves;

"Therefore, for and in consideration of the agreements hereinafter stated, second party agrees,

"First, To attend to and supervise the cleaning of all gloves offered to her for cleaning by first party.

"Second, To allow the first party a fee or commission of twenty per cent (20%) on the schedule of prices hereinafter named, which said fee or commission may be retained by first party on all collections made by it.

"Third, To be responsible for the loss, destruction or damage of or to any and all gloves entrusted to her for cleaning, so long only as same may be in her charge.

"And, in consideration of the foregoing agreements by the second party, and the additional consideration that the use of said second party's name will be a most valuable asset to first party's business, said first party agrees as follows:      *      *      *

"Nothing herein contained to prevent second party from carrying on and conducting all and any business second party may now have, or may hereafter secure or acquire.

"This contract to remain in full force and effect for the term of five years from date, with the privilege at the option of the second party of an extension of five years longer from the date of said five years' limit or expiration, unless this contract be sooner annulled by both parties by mutual consent, with the further proviso, agreement and understanding that second party is privileged to declare this contract canceled at any time

upon giving first party at least thirty days' notice of her intention so to do.''

Acting under the stipulation in the contract that it might be renewed, Mrs. Fritts, shortly prior to the expiration of the contract in February, 1913, requested its renewal for another term of five years, but the Swiss Cleaners & Dyers refused to renew the contract for the reason that at the time the demand was made Mrs. Fritts had removed to the State of California for the purpose of permanently there residing.

After this Mrs. Fritts brought this suit against the Swiss Cleaners & Dyers to recover damages for a breach of the contract growing out of the failure to renew it, and after the case had gone to trial before a jury, the trial judge, upon the conclusion of the evidence for Mrs. Fritts, directed a verdict in favor of the Swiss Cleaners & Dyers, and this appeal has been prosecuted to review the correctness of that ruling.

The trial judge was influenced to order a directed verdict by the fact that the contract contemplated that Mrs. Fritts would give her personal attention and supervision to the work, and this she had put it out of her power to do by removing to California.

We think the ruling of the trial court was correct.

We find in the brief for appellant this statement, which is fully supported by the evidence: ''Mrs. Fritts for a number of years had been engaged in the business of cleaning kid gloves in the city of Louisville, and at the time the contract in question was made had attained the reputation of doing the best cleaning work in the city. The glove cleaning work of a large number of local stores and cleaning establishments was being done by her at the time appellee corporation was organized, and, as the contract itself shows, the new company desired to get the benefit of Mrs. Fritts' name in connection with its glove cleaning work.''

It also appears from the contract that the chief consideration that induced the Swiss Cleaners & Dyers to enter into the contract was, as said in the contract, their desire ''to have second party (Mrs. Fritts) take charge of, control and supervise so much of its business as may pertain or apply to the cleaning of gloves,'' because ''the use of said second party's (Mrs. Fritts) name, will be a most valuable asset to first party's business;'' and to emphasize the importance of this feature

in the contract, it was stipulated that Mrs. Fritts was "to attend to and supervise the cleaning of all gloves offered to her for cleaning by first party."

In view of all this, it is not open to doubt that one of the principal inducements to the making of the contract on the part of the Swiss Cleaners & Dyers was the consideration that the knowledge the public would soon acquire that Mrs. Fritts was giving her personal attention and supervision to the cleaning of gloves that might be sent to the Swiss concern would add greatly to the volume of their business, especially the glove cleaning feature of it. It was the name and reputation of Mrs. Fritts that the Swiss people wanted as much as her skill and proficiency in this class of work.

It is also, we think, a plain business proposition that when a person has obtained by individual merit a wide reputation in any particular line of business, and this personal reputation has been the means of building up a large trade in that line, the loss of the personal supervision and attention of such a person is bound to become known to the public sooner or later and consequently result in loss of business. If customers would send their gloves to the Swiss people to be cleaned because they believed that this class of work would be under the immediate supervision of Mrs. Fritts, we think it is also a fair inference that when the public discovered that Mrs. Fritts was not giving any attention to the business they would not be so desirous of having the Swiss Cleaners look after their gloves. But, however this may be, the Swiss concern contracted for the personal supervision of Mrs. Fritts and this service they were entitled to have.

The fact, too, that the Swiss Cleaners & Dyers had the right, under their contract, to solicit glove cleaning business with the assurance that the gloves would be cleaned under the supervision of Mrs. Fritts is entitled to weighty consideration, and when Mrs. Fritts moved out of the State and ceased to give any attention at all to this department, the Swiss concern was deprived of this valuable asset that it had the right to use in advertising its business. That the connection of Mrs. Fritts with the concern was a valuable asset is fully shown by the fact that the glove cleaning business of the Swiss Cleaners & Dyers increased each year during the five years Mrs. Fritts was connected with it. Indeed, during

the last year of the contract the business was more than twice as much as during the first year of the contract.

It is said, however, that before Mrs. Fritts' removal to California she did not give her continuous personal attention to the work, but that it was in charge of capable assistants who really conducted the business, and that these assistants would have continued to conduct it if the contract had been renewed.

This argument, however, does not impress us as affecting in any material way the right that the Swiss Cleaners had under the contract to demand the personal attention of Mrs. Fritts. It loses sight entirely of the value of her personal presence about the business and the knowledge that the public, and especially the large stores from whom a good deal of business was obtained, must have had of this fact. Mrs. Fritts may not have done any actual work. She may not have been about the place where the work was done every day; but, nevertheless, she was exercising a general personal supervision over it and was in a position to know that it was being done according to her ideas.

For example, her superintendent, Louis Devos, was asked and said: "Q. State whether or not Mrs. Fritts personally inspected the gloves sent to the plant for cleaning and that were cleaned and sent out? A. A great many times. Q. State whether or not Mrs. Fritts had anything to do in the actual work of cleaning gloves? A. She was in the cleaning room and seen it done and gave instructions. Q. While Mrs. Fritts was living here, did she come down to the plant every day? A. Nearly every day; yes, sir. Q. Would she stay there any length of time? A. Well, the time varied; sometimes she put in more time than others."

The law controlling the rights of parties to contracts that provide for or contemplate personal attention or service such as was provided for and contemplated by the parties to this contract is very well settled. In Shultz & Co. v. Johnson's Admr. 5 B. Mon., 496, Johnson and Shultz & Co. entered into a contract stipulating, among other things, that Johnson should furnish to Shultz & Co. "six successive crops of hemp of his own raising, embracing each year all the hemp he can raise upon not less than one hundred nor more than one hundred and sixty acres of land each year." Before the contract terminated Johnson died. After his death his

personal representative, with the consent of the heirs, undertook to grow on the land left by Johnson hemp to comply with the contract, and Shultz & Company refused to accept the hemp so grown upon the ground that the death of Johnson released them from any obligation under the contract. In holding that this contract not only contemplated but provided that the hemp furnished should be grown under the personal supervision of Johnson and consequently the obligation to receive the hemp terminated at his death, the court said:

"But, conceding, as contended by counsel, that Johnson could perform the contract, by renting the land and hiring the labor, still the expression, *of his own raising,* very clearly implies that his vocation and business was farming and raising hemp, and that the several crops which he stipulated to furnish were to be his own crops, raised by him or under his personal superintendence and direction. * * * It is true, as insisted by counsel, that hemp is a coarse, raw material; but it is also true that it is an important and valuable staple, and we have a right to presume that its value greatly depends upon the attention, experience and skill in raising and preparing it for the use of the manufacturer. We think we have also a right to know that hemp known to be raised by one individual will often command a higher price and a more ready sale than hemp raised by another, although there might be very little seeming difference in the quality. * * * It is sufficient that it was the intention of the parties that in the production and preparation of the hemp which Shultz & Company, under the contract, were bound to receive, the attention, skill and experience of Johnson were to be employed. As to the degree of skill and experience which he might possess, and its value, Shultz & Company were and had a right to be the sole judges. Much or little, they had a right to contend for and rely upon it. During the lifetime of Johnson he could substitute no person to perform this contract and obtain the benefit of it. * * * We are of the opinion that parties intended the contract to be a *personal* one. As such the administrator was not bound to perform it, and, of course, not entitled to enforce it."

The cases of Marvel v. Phillips, 162 Mass., 399, 26 L. R. A., 416; Sloan v. Williams, 138 Ill., 43, 12 L. R. A., 496, furnish other illustrations of the prevailing rule

that a contract that contemplates personal service or supervision in business requiring skill and proficiency is not assignable and ceases to be enforceable when the party whose service or supervision is the subject of the contract cannot render it. Indeed, we do not think there is any conflict in the authorities upon this subject in cases in which it is shown that the character of the engagement and the intention of the parties to the contract was that one of them should render personal service or supervision.

If we should rule in this case that Mrs. Fritts was entitled to have a renewal of this contract for another term of five years, or damages for the failure to renew it, the inevitable effect of such a ruling would be to change material provisions of the contract and to say that the condition calling for the personal service and supervision of Mrs. Fritts did not mean anything. In truth, under the facts of this case, it would be making a new contract between the Swiss Cleaners & Dyers and Mrs. Fritts by which Mrs. Fritts would have the right to assign the contract or the right to turn her business over to others and cease to give it any personal attention or supervision. Manifestly this would be giving to the contract a construction not contemplated by the parties nor sustained by the terms of the contract.

There is some question as to evidence and perhaps other matters discussed in the briefs, but we need not notice them as the facts upon which we rest our decision determine the case and are not disputed.

Wherefore, the judgment is affirmed.